617 P.2d 850

**STATE of Idaho, Plaintiff–Respondent,**

v.

**William FOWLER, Defendant–Appellant.**

**No. 12971.**

Supreme Court of Idaho.

Oct. 7, 1980.

Stephen B. McCrea, Coeur d'Alene, for defendant–appellant.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Eugene A. Ritti, Deputy Attys. Gen., Boise, for plaintiff–respondent.

SHEPARD, Justice.

This is an appeal from a conviction of assault with a deadly weapon which was entered following a trial and a jury verdict of guilty. We affirm.

Defendant Fowler had a long–standing feud with one Gene Mileck. Shortly after midnight during June, 1976, someone fired a series of shots into the Mileck home and set fire to two automobile vans belonging to

Mileck which were parked outside his home. Shortly thereafter, Mileck received a phone call, in which the caller expressed dismay that Mileck was still alive and threatened to kill Mileck the next time. Mileck identified the voice of the caller as that of defendant Fowler. Fragments of bullets were found in the Mileck home, which later ballistic tests indicated were fired from a .45 caliber revolver found in the possession of defendant Fowler.

Prior to August 31, 1977, marital difficulties had arisen between defendant Fowler and his wife, and the three Fowler children were staying with one Karen Erk, Mrs. Fowler's sister. Mrs. Erk believed that Mrs. Fowler had obtained a restraining order preventing defendant Fowler from interfering with her custody of the children. That restraining order was not issued and served on Fowler until September 1.

On August 31, 1977, an unidentified person phoned the Kootenai County Sheriff's Office to report that defendant Fowler was driving from Spokane to the Erk residence in Idaho to abduct a young girl. An officer Black was dispatched to the Erk house. During that time, defendant Fowler, who was described as highly agitated, had arrived at the Erk residence and demanded a gun, which Erk refused to give to him. Fowler then left with one of the children. Mrs. Erk talked with the Sheriff's Office about the incident because she was concerned over the safety of the child. While officer Black was driving to the Erk house, he saw a car matching the description of the Fowler vehicle moving in the direction of Spokane.

Officer Black radioed the Sheriff's Office and in turn the Washington State Patrol were notified that defendant Fowler was driving toward the Idaho–Washington state line, was involved in a kidnapping, and was believed to be armed and dangerous. On the Washington side of the state line, two troopers, Kentworthy and Wunsch, saw the defendant in his automobile and began following him. Although the defendant illegally changed lanes and was speeding, the Washington officers did not use their sirens or lights, nor did they pull him over. Since they were informed that Fowler was armed and dangerous, they intended to stop him further down the highway where more troopers were waiting.

Before reaching the planned interception point, however, Fowler pulled his automobile over onto the shoulder, stopped, got out of the car and walked toward one of the troopers. He was covered with a shotgun, frisked, handcuffed, and placed in the trooper car. Trooper Wunsch approached the Fowler car and noted two weapons in plain view on the back seat of the car. He opened the car door, took those two weapons which were unloaded, and found a third loaded .25 caliber automatic underneath the front seat of the car. Those guns were placed on the hood of the Fowler vehicle.

At about that time, Idaho officer Black arrived at the scene, as did Mrs. Fowler, accompanied by one Tuefel. Tuefel indicated that the two unloaded guns from the back seat belonged to Tuefel and had been stolen. Mrs. Fowler informed Trooper Kentworthy that another gun still remained in the car. Further examination of the vehicle revealed an unloaded .45 caliber revolver under the front seat of the vehicle, which Mrs. Fowler then stated was used "in the Mileck deal." The Washington state troopers retained the loaded .25 caliber automatic weapon for further proceedings in Washington and handed over the other three firearms to Idaho officer Black.

It is defendant Fowler's principal contention on appeal that the .45 caliber revolver was the product of an illegal search, was illegally seized and should have been suppressed. Because of the above recited complex facts, it may be useful to note what this case does not involve. Fowler had voluntarily pulled off the highway, stopped his vehicle, exited therefrom, and approached the police. Hence, the case does not involve the legality of an involuntary stop. Our narrow focus is on the question of whether the Washington state troopers lawfully searched for and seized the .45 caliber revolver hidden beneath the front seat of the Fowler vehicle. That issue must be ad-

dressed with particular attention to Washington state law.

The case at bar is distinguishable from *State v. Lesnick*, 84 Wash.2d 940, 530 P.2d 243, *cert. denied*, 423 U.S. 891, 96 S.Ct. 187, 46 L.Ed.2d 122 (1975). In *Lesnick*, the Washington Court held that the police had no right to rely on an anonymous tipster to stop Lesnick's car, and because that stop was not warranted, the police had no right to be in a position to observe gambling paraphernalia in the back seat of defendant's vehicle. Here, however, Fowler had voluntarily pulled his vehicle off the highway, stopped and exited his car. Hence, Washington state trooper Wunsch had a right to be where he was when he observed the two weapons in plain view on the back seat of the car since Wunsch's presence at the car was not the result of an illegal stop.

We hold that the officer had probable cause to initially enter the car. He had been informed, through a police agency, that Fowler was driving a vehicle into the State of Washington, was armed and dangerous, and was in the course of committing a felony. When he approached the car, he saw two weapons in plain view on the back seat. A Washington statute prohibits the carrying of a loaded pistol in a vehicle.[1] The trooper's investigation of the status of the weapons and his subsequent finding of the third loaded weapon were certainly warranted and no more than would be expected of a reasonable and competent police officer.

Further, as above noted, that entry was terminated and those weapons placed upon the hood of the Fowler vehicle. None of those "seized" weapons were relevant to the instant case nor were they offered or admitted in evidence. It was only after the arrival on the scene of Fowler's wife and Tuefel that an additional search ensued which produced the weapon in controversy here. The facts as noted above support the finding of probable cause to search for the fourth gun. Fowler, who was accused of kidnapping, was found in a car with a child and a loaded gun. The information leading to this belief stemmed in part from a statement of an eyewitness (Erk), that she feared for the safety of the child. The two other guns found in the car were identified as being stolen. Fowler's wife indicated that another gun, which may or may not have been loaded, was still in the car. When the police are told that a gun is still in a car that is parked on the side of a heavily used highway and the situation is as potentially explosive as this one was, it would be unreasonable for the police not to search for the gun. Once the police have probable cause, they may search a car parked on a public highway without a warrant under the automobile exception. *See Cardwell v. Lewis*, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974); *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *State v. Pate*, 12 Wash.App. 237, 529 P.2d 875 (1974); *State v. Orcutt*, 22 Wash.App. 730, 591 P.2d 872 (1979).

It is also argued that the delivery of the gun by the Washington state trooper to Idaho officer Black was somehow invalid. The requirement for search warrants protects an individual from unreasonable official intrusions. Here, the search was valid and once the weapon had been lawfully seized by the Washington state trooper, the intrusion into privacy ceased. Officer Black, by accepting the delivery of the gun from the Washington state trooper, was not intruding into Fowler's privacy. Black was familiar with the Mileck assault, knew that Fowler was a suspect and had knowledge, through Mrs. Fowler, that the weapon had been used in the Mileck assault. We hold that argument to be without merit.

We turn now to the admissibility of the testimony of Fowler's wife. At the

---

1. The applicable Washington statute, R.C.W.A. 9.41.050, provides in pertinent part: "No person shall carry a pistol in any vehicle unless it is unloaded * * * without a license therefor as hereinafter provided."

time of trial, Fowler and his wife had been divorced. Fowler asserts, nevertheless, that the testimony of his ex–wife should have been excluded under the marital privilege doctrine. I.C. § 9–203(1) encompasses two privileges: (1) neither spouse may testify for or against the other without the other spouse's consent, and (2) neither spouse may testify as to any communication made by one to the other during marriage. A divorce prior to trial terminates the incompetency of one spouse to testify against the other. *See State v. Anspaugh*, 97 Idaho 519, 547 P.2d 1124 (1976). Divorce, however, does not terminate the privilege afforded marital communications made during the existence of the marriage. *State v. Anspaugh, supra.* That privilege may encompass non–verbal acts which are communicative in nature, *i. e.*, the shaking or nodding of the head or the like.

■■ At the time of trial, Fowler's former wife testified that Fowler possessed a .45 caliber revolver at the time of the Mileck assault, that the gun was kept in Fowler's nightstand, and that she moved the gun to a different location in the summer of 1977. Fowler argues that knowledge of the gun was a confidential spousal communication. We do not agree. Knowledge of the possessions of one spouse and their location is generally not a spousal communication. *See United States v. Bolzer*, 556 F.2d 948 (9th Cir. 1977). Her testimony as to her own actions is also not a marital communication. *See State v. Hermes*, 71 Wash.2d 56, 426 P.2d 494 (1967). Hence, we find no merit in Fowler's assertion that the testimony of his former wife was inadmissible.

We have examined appellant's remaining assertions of error and find them to be without merit. The judgment is affirmed.

McFADDEN, J., concurs.

DONALDSON, C. J., and BAKES, J., concur in the result.

BISTLINE, Justice, concurring in the affirmance.

I write only because of the majority's failure to deal with cases in both Washington and Idaho which on their face appear to be irreconcilable with the opinion the Court announces today. *State v. Post*, 98 Idaho 834, 573 P.2d 153 (1978); *State v. Miles*, 97 Idaho 396, 545 P.2d 484 (1976); and *State v. Orcutt*, 22 Wash.App. 730, 591 P.2d 872 (1979), would appear to mandate that we reverse. Although I am not persuaded that we should reverse, I decline to join in an opinion which follows *Miles* by only four years, but which fails to distinguish that case from this.[1] Accordingly, I endeavor to set forth and discuss my view of these cases, from which I conclude that, although the question is very close, *Miles* is distinguishable, albeit the degree is slight.[2]

In *Miles* the police were told by people from whom they had purchased marijuana that the defendants would be arriving with more marijuana in 45 minutes. When the defendants pulled into the driveway two hours later, the police ordered them to lie on the ground and then searched the car, where they found a large quantity of marijuana. This Court, first holding that the search could not be justified as incident to an arrest, then stated that *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed.

---

1. *Post*, in which I participated, was predicated entirely on the earlier holding of *Miles*, in which I did not participate.

2. I doubt the validity of the premise in the Court's opinion that because Fowler stopped his car "voluntarily," there is no need to consider whether the stop was proper. The police had every intention of stopping Fowler, and the fact that he stopped before being signaled to do so does not automatically legitimatize the search. This is not the situation where the police inadvertently happen upon a parked car; rather, this is simply a case where Fowler rather than the police picked the place to pull over. Since the police would have been justified in stopping Fowler anyway, *see, e. g., Adam v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *State v. Hobson*, 95 Idaho 920, 523 P.2d 523 (1974); *see also State v. Deschamps*, 94 Idaho 612, 495 P.2d 18 (1971), the Court should accept this for what it was—a legitimate stop by the police.

543 (1925),[3] requires that the State show that it is impractical to obtain a search warrant in order to justify a warrantless search of an automobile. The Court concluded that the State had not shown that it was impractical to obtain a search warrant:

"Taking judicial notice of the fact that there are four magistrates in Coeur d'Alene available for issuing search warrants, it would not seem unduly burdensome on the police to station one of four officers present with the car, while the others made the short drive into town to secure the search warrant. Here, there simply were no exigent circumstances making it impractical to gain a search warrant." 97 Idaho at 400–01, 545 P.2d at 488–89.

In *State v. Post*, 98 Idaho 834, 573 P.2d 153 (1978), Officer Richard smelled marijuana on the defendant and observed smoke and two hand–rolled cigarettes in the defendant's car, which was parked in a parking lot adjacent to a street. Richard then searched the defendant's pockets, finding a small amount of marijuana, and the defendant's car, where he found 7 ounces of marijuana. This Court held first that the search of defendant's pockets was unlawful as there had been no lawful arrest and secondly that the search had exceeded that which was permissible as incident to an investigative stop. As to the search of the car, the Court held as follows:

"The state, at oral argument, conceded that there was nothing in the record of this case suggesting any exigent circumstances, other than the mere presence of the car in a parking lot near a public street, and acknowledged that under our decision in *State v. Miles, supra*, there has not been a showing of exigent circumstances sufficient to avoid the warrant

requirement on that basis." 98 Idaho at 838, 573 P.2d at 157.

*See also State v. Landers*, 97 Idaho 899, 556 P.2d 858 (1976) (Attorney General confessed error where police, on smelling marijuana in parked car, requested occupants to step out and then searched car).

In *State v. Orcutt*, 22 Wash.App. 730, 591 P.2d 872 (1979), the police became suspicious of defendant's conduct and followed him to where he had parked and left his car. In looking for vehicle identification in the car, the police observed an open pack of Zig Zag cigarette papers and what appeared to be some brownish flakes of marijuana. The police subsequently located defendant nearby and arrested him for driving with a suspended license. The officers then told the defendant that his car would have to be moved, and defendant consented to their moving the car back to the store parking lot so that his belongings would be secure. At this point the officers made a second search of the interior of the vehicle. The court held that this was not a case where it was not practicable to secure a warrant, and found insufficient evidence of exigent circumstances to justify the search without a warrant:

"The vehicle here was in no danger of departure. It was secure. There was more than one officer available to effect a defendant's arrest and obtain the warrant while the other watched the vehicle and secured its contents. Absent exigent circumstances, the warrantless search even with probable cause violated the Fourth Amendment." 591 P.2d at 876.[4]

If the exact language in these three cases were to be followed in the present case, it would appear that the incriminating gun

---

3. In *Carroll*, although the Court stated that "[i]n cases where the securing of a warrant is reasonably practicable, it must be used," 267 U.S. at 156, 45 S.Ct. at 286, the Court upheld a warrantless search of a vehicle. In that case the police had no chance to obtain a warrant before coming upon the car. Nor, apparently, did they have probable cause to take custody of the occupants of the car to prevent its further movement until a search warrant could be obtained. All that they had was probable

cause to believe that the car contained contraband. Such was the justification for an immediate search of the vehicle.

4. *But see State v. Pate*, 12 Wash.App. 237, 529 P.2d 875 (1974), in which the panel of judges included two who later joined in *Orcutt*; there the court upheld a warrantless search for drugs of a car parked in a public parking lot on the basis of *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970).

**552**

should be suppressed. The incident occurred about 6:00 p. m. on a Wednesday, and there were numerous police officers present; under the rationale of *Miles*, one officer could have been left to secure the car while another went to obtain a warrant.[5] I doubt, however, that such is in harmony with the view of the average lay person, whom I surmise would find that it is not unreasonable for the police to search a car where they have good reason (probable cause) to believe it contains a gun in the circumstances present in this case. Nor do I believe that suppression has to follow from *Miles*.

The trial court, Judge Prather, in a very thorough and well reasoned opinion, noted this problem: "it is arguable that the court would have a difficult time finding the search in the present case to be justified, absent an overruling of the decision in *Miles*." Judge Prather went on to note that "[e]ven though *Miles* may be too recent to be overruled, it is important to realize that the *Miles* decision totally fails to address the case of *Chambers v. Maroney*, *supra* [399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970)]."

In *Chambers*, as discussed by the trial court, the United States Supreme Court upheld the warrantless search of an auto. In that case, the police arrested the occupants of the vehicle shortly after a robbery on the basis of a description given by witnesses. The Court upheld the subsequent search of the car as follows:

"Neither *Carroll*, *supra*, nor other cases in this Court require or suggest that in every conceivable circumstance the search of an auto even with probable cause may be made without the extra protection for privacy that a warrant affords. But the circumstances that furnish probable cause to search a particular auto for particular articles are most often unforeseeable; moreover, the opportunity to search is fleeting since a car is readily movable. Where this is true, as in *Car-*

*roll* and the case before us now, if an effective search is to be made at any time, either the search must be made immediately without a warrant or the car itself must be seized and held without a warrant for whatever period is necessary to obtain a warrant for the search.

. . . . .

"Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the 'lesser' intrusion is permissible until the magistrate authorizes the 'greater.' But which is the 'greater' and which the 'lesser' intrusion is itself a debatable question and the answer may depend on a variety of circumstances. *For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant.* Given probable cause to search, either course is reasonable under the Fourth Amendment.

"On the facts before us, the blue station wagon could have been searched on the spot when it was stopped since there was probable cause to search and it was a fleeting target for a search. The probable-cause factor still obtained at the station house and so did the mobility of the car unless the Fourth Amendment permits a warrantless seizure of the car and the denial of its use to anyone until a warrant is secured. In that event there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is obtained." 399 U.S. at 50–52, 90 S.Ct. at 1980 (footnotes omitted) (emphasis added).

*See also Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 2594 n. 14, 61 L.Ed.2d 235 (1979) (in reply to the State's argument

5. No contention is made that the police were without authority to detain this car. Mrs. Fowler, to whom it was released, had no apparent ownership interest in it as it was registered

to the Church of Jesus Christ Christian, Inc. Thus there is no need to discuss whether the police would have had the right to detain the car if the owner had demanded it.

that "if the police were entitled to seize the suitcase [taken from a car], then they were entitled to search it," the Court noted that requiring police to seize and hold a vehicle rather than search it immediately "would have imposed severe, even impossible, burdens on many police departments," while no such burdens were likely to exist with respect to the seizure of personal luggage).

It is important to note at this point that neither *Miles, Post,* nor *Orcutt,* in discussing the existence of exigent circumstances, dealt with *Chambers.* The trial court in the present case thus held that "[s]ince the *Chambers* doctrine has not been expressly rejected by the Idaho Supreme Court, it is applicable herein," and on this basis held that the automobile exception to the warrant requirement applied, making the warrantless search permissible.

The question now before this Court, which the majority opinion disposes of rather perfunctorily, is whether the police should have delayed the search until they could obtain a warrant, *i. e.*, were the police required to post one officer to guard the car for the time it would take another officer to obtain a warrant? In discussing this general question, one text has noted that "[t]he lower courts have experienced considerable difficulty with this question, which is none too surprising in light of the fact that the Supreme Court has not indicated what possible showing of exigent circumstances (if any) is needed to justify a warrantless search." W. LaFave, 2 Search and Seizure § 7.2(c) at 526 (1978).[6] There is no reason, however, for this Court to merely sit by. The question is squarely before us and the way is made clear by the light of the exhaustive treatment accorded the question and handed to us in Judge Prather's memorandum decision.

The majority of this Court, however, decline the thrown gauntlet, preferring to base their holding that this warrantless vehicle search was permissible solely on the bald assertion that "[o]nce the police have probable cause, they may search a car parked on a public highway without a warrant under the automobile exception."[7] Apparently the majority believes that a search while the car is parked in a parking lot near a street, as in *Post*, is unacceptable,

---

**6.** For cases suggesting that the police should post a guard over the vehicle while another officer attempts to secure a warrant, *see, e. g., State v. Massey*, 310 So.2d 557 (La.1975) (no exigent circumstances where at least ten police present at search, owners of car under arrest, car locked, and keys in custody of police); *Freeman v. State*, 258 Ark. 617, 527 S.W.2d 909, 916 (1975) (no reason exists why some officers should not have maintained a guard to prevent the removal of evidence while a warrant was obtained); *People v. White*, 392 Mich. 404, 221 N.W.2d 357, 363 (1974), cert. denied, 420 U.S. 912 (1975) ("appellant's automobile was parked and unoccupied when the police arrived with an ample number of officers to allow the automobile to be guarded while a warrant was sought"); *State v. Navarro*, 312 So.2d 848, 851 (La.1975) (no exigent circumstances where both occupants of car were under arrest and were to be taken to jail); *United States v. Bradshaw*, 490 F.2d 1097, 1103–04 (4th Cir.), cert. denied, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974) (no exigent circumstances "since two of the agents could have guarded the truck smelling of moonshine whiskey while the third obtained a warrant without significant risk of loss of evidence").

Other cases, however, have not been willing to require the police to post a guard while they sought a warrant. *See, e. g., United States v.*

*Frick*, 490 F.2d 666 (5th Cir. 1973), cert. denied 419 U.S. 831 (1974) (in justifying search of car incident to lawful arrest); *United States v. Evans*, 481 F.2d 990, 994 (9th Cir. 1973) ("standing guard still represents the same interference with property rights as well as an unnecessary use of law enforcement personnel"); *United States v. Bozada*, 473 F.2d 389, 391 (8th Cir.), cert. denied 411 U.S. 969, 93 S.Ct. 2161, 36 L.Ed.2d 691 (1973); ("[w]e are not impressed with the notion that a stakeout or limited seizure of the trailer should have been made while a search warrant was being procured. That could well pose more problems than it would solve"); *United States v. Menke*, 468 F.2d 20, 23 (3d Cir. 1972) ("[w]here an automobile is the subject of the search, the possibility of its movement and the concomitant disappearance of the contraband is a more critical factor than a count of the number of agents present who could be dispatched to a warrant–issuing authority").

**7.** Although the majority also discusses the fact that the police were told that a gun was in the car, that the car was parked on a heavily–used highway, and that the situation was "potentially explosive," these factors go unmentioned in the conclusionary sentence.

**554**

but a search is permissible if the car is parked on a public way.

Although I cannot accept that reasoning, nonetheless, I believe that this case is distinguishable from *Miles.* "Impracticability" was given meaning in *Coolidge v. New Hampshire,* 403 U.S. 443, 462, 91 S.Ct. 2022, 2035, 29 L.Ed.2d 564 (1971):

> "And surely there is nothing in this case to invoke the meaning and purpose of the rule of *Carroll v. United States*—no alerted criminal bent on flight, no fleeting opportunity on an open highway after a hazardous chase, no contraband or stolen goods or weapons, no confederates waiting to move the evidence, not even the inconvenience of a special police detail to guard the immobilized automobile. In short, by no possible stretch of the legal imagination can this be made into a case where 'it is not practicable to secure a warrant,' *Carroll, supra,* [267 U.S.] at 153 [45 S.Ct. at 285], and the 'automobile exception,' despite its label, is simply irrelevant." (Footnote omitted.)

In *Miles,* all those involved in the criminal enterprise were under restraint, the car was parked in a private driveway, apparently with no one else around, and the police had known for some time that the car would be arriving, allegedly with drugs. Moreover, the location of the search was only a short distance from town. In *Post,* that issue was not a problem as the State conceded it at oral argument. In *Orcutt,* which also involved drugs, the police had complete control of the car, which was being put in the parking lot of a store, and the only person around with an interest in the car was under arrest.

In the present case, however, there were several people in the area of the car who were not under arrest; the police were not yet sure what action was to be taken with Fowler, or the car; three guns, including one that was loaded, had already been found in the car; the search was for another gun, not drugs; and the car was parked on a heavily traveled roadway, at some distance from the nearest city. The facts of this case are thus more similar to those in *Chambers* than in *Miles, Post,* or *Orcutt,* and, like the trial court, I believe that *Chambers* is controlling and that it would have been impractical for the police to obtain a warrant. The search was therefore justified. However, it remains for this entire Court, not simply one member of this Court, to delineate the effect of today's decision on *Miles* and *Post,* and until that is done the bench and bar will simply have to wait out some later decision.

The judgment of conviction should be affirmed.